It seems to me that the key issue before the court today regarding this matter is whether or not Ms. Humphrey-Baker was a qualified individual with a disability able to perform the essential functions of the job with or without accommodation. In order to resolve that issue, I believe this court is going to have to answer one elementary question, and that is whether or not ramp duties were an essential function of Ms. Humphrey-Baker's job responsibilities. The defendant argued and the district court adopted the position that ramp duties were an essential function of her job. The defense points to the job description at tab 33, which breaks the job duties into two distinct classifications, one being customer contact, primarily ticket counter agent and gate agent, duties that Ms. Humphrey-Baker was trained and certified by United Airlines to do, and secondly, a distinct classification of job duties called ramp duties, working on the tarmac, physical labor, directing planes to the gate, loading and unloading baggage from planes, job duties that United Airlines chose not to train or certify Ms. Humphrey-Baker. Well, counsel, there really were, as I understood it, four areas, four duties, the ramp, the gate, the ticket counter, and the baggage area, and it was my understanding that even though there was seniority bidding, every employee had to be able to fill in at any of those four positions. That is the evidence of the defense witnesses, Your Honor. What they failed to discuss in that evidence is the necessity of training, and if we look at tab 31, there's a local agreement between United Airlines saying that employees must be trained and certified, the training must be ongoing, and initial training must be done by a certified trainer. Does that provision say that that's a precondition of their working in a particular job? It does not, Your Honor. It just simply says that they must be trained and it must be ongoing and it must be done by a certified trainer. Did your client, in fact, work on the ramp? She would occasionally, this came out in her deposition, at the end of the day when there were no more planes coming in or leaving from the ticket counter, she didn't have anything to do, they would send her to the baggage claim area to what she called sling bags. That evidence was excluded by the court in this proceeding, but that was what her evidence was. But no, she did not work at the ramp on any regular or assigned basis. The other difficulty I had to some extent with your position is that even in the least physically demanding segment of the job classification, which I think would probably be the bags, bags up to 70 pounds, to tag them and do the other things that we're all familiar with. So I wonder if that affects the analysis. Your Honor, in fact, the bags could even be as much as 99 pounds, but Ms. Humphrey-Baker's evidence is that the ticket counter agents did not lift 70-pound or 99-pound bags. When there was a heavy bag, they would call to the person next to them, can you give me a hand? They helped out and they did it. But she returned to work in August 2002 and worked for nearly one year without any accommodation because her employer refused to accommodate her, would not let her return to work with any restriction, and she did so and completed all of her duties. This is at paragraph 50, Your Honor. She returned to work without restrictions. She was on her feet throughout the day, moving throughout the airport, handling all luggage that needed to be handled without complaint or criticism. So she did, in fact, perform all of her duties as a ticket counter agent subsequent to her injury and after her return to work. At the time of her final return to work, the release she was given by her family physician, can we really characterize that as a total release given the fact that he also said he wanted to see how she did and wanted to see her in a week's time? She did not return to work from that release, Your Honor. The release that returned her to work was in August 2002. And at that time, he did release her without restrictions at her request because her employer wouldn't take her back with a restriction. She wanted to go back to work later. She went to her doctor and asked for a release and got it. He did express in his deposition some reservations about whether or not long-term she could endure the pain or the difficulty of working. But she did it for a year and she did endure the pain. And she says in her declaration, I did that. I wanted to keep my job. But I think we have to come back to the question of training because the employer made a conscious decision not to train Humphrey Baker and apparently others for ramp duties. And the station manager, Mr. Liefer. Ramp duties. Ramp duties. Yeah. And the station manager, Mr. Liefer, testified in deposition when I questioned him about accommodating her. He said he couldn't do it because if we gave her a stool, we might move her to the ramp. I then reminded Mr. Liefer of Mr. Liefer. He just told me an hour ago in the deposition that she couldn't go to the ramp because she wasn't trained. His response was, quote, we would train. They did not train her. How can a duty for which the employer made an affirmative decision not to train an employee be an essential function of that employee's job? And that is, I think, the troubling question. That's a question that has troubled me. I cited the court to the 2008 decision of the California Supreme Court in Lanikey, having to do with the Family Rights Act, where the court said that a family medical leave includes a health condition rendering the employee unable to perform the essential functions of the position. Now that statute is part of the Fair Employment and Housing Act, as is the California Disability Statute. They are not identical, but they are related. And I thought the Supreme Court's rationale might be instructive as to how they might resolve this issue if they confronted it. And they said when they were asked to determine what the functions of the position are, they said that means the ability to perform the functions in the employee's current environment, and that the phrase applies to the job assigned to the employee by his employer, and does not refer to an inability to perform essential functions generally. Counsel, before you run out of time, I have a question just to clarify the extent of your argument. The policy of this employer is to have an extended illness status that lasts for three years and no more than that. I do not understand your argument to be challenging that policy generally, that after three years, they don't have to be carried any longer. You're not challenging that as a neutral policy? No, Your Honor. But prior to that, she had numerous times requested accommodation. It was denied. No, I understand that. I just want to be sure that I'm clear. Let me ask you this. Now, she had worked in the ramp in the past, had she? Only very occasionally, very sporadically, just helping out, never assigned to work there. Never assigned to work in the ramp. Now, when you work in the ramp, what does that consist of? It's working outside on the tarmac, moving aircraft, airplanes moving around you, loading and unloading bag, kneeling in the pit of the aircraft, stacking and unstacking luggage. Do you get inside the aircraft? Yes, sir. So you have to climb up in there. Yes, sir. Is that right? Yes. And then you move. When the bags, I'd just like to know what happens to my luggage, you know. And I've never seen a woman handle luggage that's transported into the plane. So they have these ramps, these conveyor belts that take the luggage up. And then there's someone inside the interstices of the airplane and they stack it up. Is that what they do? Stack it and load it so the balance in the aircraft is appropriate for the flight. And so she did that on occasion? No, sir. What did she do? All she did was go to the baggage area inside the terminal if there was nothing else for her to do and sling bags from the ramp, from the activities from the ramp people, bringing them to that location onto a conveyor belt. So all she ever did was when they bring that cart in with the bags and they're near by the conveyor belt, she just would pick them up and toss them on the conveyor belt so they come around. Yes, sir. She never crawled into the into the belly of the aircraft stacking? She was not permitted to do any of that. She was not trained to do any of that, your honor. Are there women that do that? I don't know. In the declaration of Terry Parisi, a supervisor, a manager in 2008, she claims we're trying to get everyone trained for the ramp. We haven't completed it yet. We hope to have it done by 2009. I don't know, your honor. How many how many women work in that in that ramp in the plane? I think the numbers are that on the ramp area, it is I don't know that there's evidence before this court of that, your honor. So I better not say, well, there's no evidence whatsoever. Well, the evidence from the depositions was that the ramp people were primarily men. The women, some of them are now being trained for the ramp since this case was initiated. They were not trained previously. And are those women also trained to work at the counter? Oh, yes, sir. Most of them did work at the ticket counter and or the gate where Ms. Humphrey Baker worked. They work in the ticket counter and then they have to go and get into the into the bowels of the airplane and stack the luggage only if they have been trained to do so, your honor. And the evidence we have now is that they're trying to do it, but they haven't completed it yet. What training do they go through? Well, the testimony of Mr. Leifer was that the tarmac is a dangerous place for people to be walking around on. That's why training was essential for that. I don't know specifically what the training is, but they go through initial training with a certified trainer and ongoing on the job training to make sure everybody is operating safely on the tarmac. Of course, Ms. Humphrey Baker did not go through any of that training. All right. Thank you. I appear to be running close to being out of time, your honor. You're over by two minutes. Oh, my goodness. Just like United is. I had two other issues I wanted to address, but I think I'm too late on those. What are the issue of the evidence exclusion and judicial estoppel, your honor? Well, maybe. Well, go ahead. We'll give you a minute right quickly on the evidence exclusion, your honor. The Supreme Court said in G.E. versus Joyner 5522 U.S. 136 141 that proof of an abuse of discretion requires a showing of manifest error. In this case, we have rulings by the district court. Excluding on hearsay grounds, primarily and other grounds, evidence at a 2006 reasonable accommodation statements made by the manager, they're excluded. In 2003, there was a reasonable accommodation meeting statements made by the manager. Same objections were made. They were included. In addition, your honor might have testified in her declaration that in her 11 years working the ticket counter and gate, she performed these job duties, ticket counter and gate, ticket counter nine years, gate about two years. The court excluded on foundation and personal knowledge basis, the evidence that she worked 11 years at the ticket counter and what those duties were. The court overruled the identical objections to the job that she did for only two years. I don't know how to I don't know how to reconcile those. OK, I get what's the other point? That's it. Now, as far as the evidence exclusion, your honor, I think there are irreconcilable objections and sustaining of objections. OK, anything else? Finally, on judicial estoppel, your honor, the defense argues that her statement that she was able to work without accommodation and her statement in her 2003 Social Security application that I am unable to work due to my disability on June 13th, 2003 are inconsistent. In fact, they are not. She did work without accommodation from August 2002 to July 2003. The statement that she became unable to work due to her disabling condition on June 13th was written into the application by the Social Security people. It is factually accurate. Her her work comp doctor said in the spring of 2003 she should sit part of the time. United Airlines received that report on June the 12th. On June 13th, Mr. Yackel, the station manager, called her and said, you don't work anymore. We don't accommodate restrictions. There is no inconsistency, your honor. She she was she was unable to work on June 13th by the decision of her employer. I thank you all very much. Sorry, I took so long. To respond to counsel's issue that he believed was the most important one to bring to your attention, that is, whether or not the Miss Humphrey Baker had been trained on the ramp duties. I think the answer that suffices to that is the one that just Judge Ripple pointed out. She didn't she was was not trained on the ramp duties, yet she was still occasionally assigned to ramp, so it wasn't necessary to have been trained fully in order to fulfill that position. You know, I missed the point of what you were saying because your voice is. Speak a little louder. Let me just repeat that I believe that Mr. Nolan's point that the most important thing for your honors to consider is the fact that the plaintiff was not trained formally on ramp duties is a crucial issue in the case. I don't agree with him because I think the answer is, as Judge Ripple pointed out, even though she had not been formally trained, in fact, she had been required to go to ramp occasionally and unload the bags. And she could have been assigned to ramp at any time. That was part of what was happening in 2006 when she tried to return. As the judge below recognized, there was no foundation laid by the plaintiff for her evidence that she, in her declaration and in her co-worker's declaration, as to the nature of the job duties in 2006 when she wanted to return. In fact, there was evidence presented by United. I mean, so how do we have summary judgment if we have conflicts in the evidence? Well, Your Honor, I think that the conflict as to the essential functions, the plaintiff had the burden of establishing that she was a qualified worker with a disability. Otherwise, she's not protected by FEHA at all. So she has the burden of proving that she has to prove two things. One, that she was able to perform the essential, that what the essential functions of her job were, and then secondly, that she was able to perform them medically. So as I understand it, the basic issue with respect to her declaration was the change in time. In other words, whatever used to be true isn't true anymore. And so without current knowledge, whatever used to be is interesting historically, but not probative of what the actual job is right now and into the future. Is that basically what the issue was before the court? Yes, I think that's exactly right. In fact, there was evidence put in by United that because of a new agreement with JetBlue and because staffing had been reduced post-9-11, more customer service representatives were being required to do more and more different duties. There was the reconfiguration of the ticket counter area so that even if you were working at the ticket counter, you'd have to step away from the counter frequently to help people at the kiosks. You'd have to help with baggage. You might have to help people actually physically move about. And this evidence was uncontroverted by the plaintiff. She did not rebut United's evidence of what the essential functions were in 2006. Therefore, she failed to carry the day on that prong of establishing she's a qualified worker. And then secondly, she did not present evidence to show that she was medically able to do the job in 2006. Along those lines, perhaps you can help me. This medical release given by the family physician, effective June 13th, 2006, it was an unrestricted release, at least on its face, and I'm having somewhat of a difficult time seeing why that does not create a genuine issue of triable fact that at least gets the plaintiff past some re-judgment. Can you help me? I think I can. I hope I can. First, in order to get to that question, you would have to conclude that the trial court made an incorrect ruling with respect to the judicial estoppel. Under the judicial estoppel that was applied, the plaintiff was precluded from going forward with trying to prove that she could work without restrictions. It did not affect her ability to try to prove she could work with restrictions. Wouldn't the release still be relevant and probative on the question of whether she could work with an accommodation? Yes. I think that is possibly true. That is true, Your Honor. I agree with that. That's to me the sticking point. Okay. However, if you look at the content of the note and the circumstances under which it was obtained, I think it is still not a sufficient ground on which to base a verdict for the plaintiff. Yeah, but that's something the jury can decide. You know, you say, well, you know, the doctor said this, and maybe he's pushing it a little. That's something the trier of fact needs to decide. I think, Your Honor, that in this case, the evidence was so overwhelming that it was not a credible note, that it was not required, that the judge was within her discretion to grant summary judgment. Well, how do we know that unless we hear what the doctor has to say, whether it's credible or not? You can't look at a piece of paper and say it's credible. Well, we do know what the other extraneous evidence was, and that evidence was before Judge Phillips. Tell me what was the evidence that might permit us to characterize this release as not absolute but conditional? The evidence was that, first of all, it contradicts the same doctor's opinion that she needed to sit down on a stool, that it would help her to have a stool. It also, there was evidence that the doctor did not even understand what the essential functions of her job were. And what evidence was that? That evidence was that tab 21, pages 2 and 5, tab 22, page 9. One moment, please. That Dr. Thornton testified in his deposition that even at the time that he gave her the note, he wanted to see her, the note was effective only a week, one month from the date that he gave it. He saw her on May 8th, 2006, released her to return to work on June 13th, more than a month later. So one asks, how can he know how she's going to feel a month later? And then asks, wants her to come back a week following that to check on her condition. Yeah, it's, I think you might be thinking of page 40 of the doctor's deposition. Yes. He basically, he says, if I returned her to work in five weeks and saw her in six weeks and she was not tolerating it, I'd be able to put her back off work or modify her work duties after she had done whatever she was going to be able to do for one week. So you had some concerns about whether she'd be able to tolerate it? Answer, yes. Did you express those concerns to her? Answer, yes. So I guess the legal question is whether to read his note saying released to work in the context of his deposition testimony or by itself, because if we look at it by itself, it supports the plaintiff. If we look at it in the context of this deposition testimony, he's basically saying I'm giving her a one week trial run to see if she can stand it and maybe yes, maybe no. So what, what are we supposed to do? I think you're supposed to consider all of the evidence that was before the trial court. And I think you can reasonably conclude that no matter what jury looked at this evidence, they could not have concluded that this plaintiff could go back to work at that time, either with or without accommodation. Well, you know, how could we do that? You know, there, there are lots of people with aches and pains and disabilities that carry on their jobs and do it. Well, I'm sitting here, I got pain in a lot of places. But are you asking for accommodations? You know, that isn't a bad idea. I'd like to have a chauffeur and a limousine drive me around. Let me make one more comment then with respect to the basis for the judicial estoppel being imposed. And to some extent, I think it goes to this issue as well. The, there is evidence that the statement that was made on the social security disability application in 2003 was, was inconsistent with what was stated in the lawsuit. You can impeach her on that, see? You can impeach her on that. But Your Honor, I think it comes down to a more equitable principle here that, which I would characterize as an attempt to double dip or to dissemble. When the facts and circumstances fit the needs of the plaintiff. She made a representation in 2003. Well, what's wrong with double dipping? I don't think you can double dip unless you have a reasonable explanation for why you're doing it. What does double dipping mean? It means that this plaintiff. I'm getting social security and paid. Am I a double dipper? No, Your Honor. Your Honor, I think it has to do, I don't think you made any misrepresentations on any applications in order to find yourself in the situation you are now, unlike this plaintiff. I didn't have to make any, as far as I know, any representations. But this, to me, you just got a lot of questions, factual issues that need to be decided by a jury. And, you know, things have changed in the airline industry. I remember when I had a dozen cases, maybe not quite a dozen, maybe fewer than that number, when airlines were terminating flight attendants when they were like, whatever it was, 35 years old? 32 years old. As one of them said to me when I asked, well, what's this case all about? She said, exclaimed, Judge, they say I'm an old woman, you know? Well, she looked pretty young to me. But anyway, that's the way we treated people in the airline industry. Now you go into the airlines, and you're taken care of by flight attendants, and there's some young women there, elderly women there, too. And when I tell them what I did many years ago for them, they give me two little bags of peanuts instead of one. Is there anything else I can help you with? Thank you.
judges: Pregerson, Ripple, Graber